ORIGINAL

Approved: _____
DANIEL C. RICHENTHAL/JANIS M. ECHENBERG/RAHUL MUKHI
Assistant United States Attorneys

Before: THE HONORABLE BARBARA C. MOSES
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**
                                  :
     - v. -                       :    Violations of
                                  :    18 U.S.C. §§ 1956(h),
JULIA VIVI WANG,                  :    1956(a)(2)(A), and 2
  a/k/a "Julia Vivian Wang,"      :
  a/k/a "Vivian Pink,"            :    COUNTY OF OFFENSE:
  a/k/a "Wang Wei,"               :
                                  :    NEW YORK
               Defendant.         :
                                  :
- - - - - - - - - - - - - - - - - x

DOC # ____

16 MAG 1798

SOUTHERN DISTRICT OF NEW YORK, ss.:

   JASON P. ALBERTS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Money Laundering)

   1.  From at least in or about April 2012, up to and including at least in or about April 2013, in the Southern District of New York and elsewhere, JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

   2.  It was a part and an object of the conspiracy that JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, and others known and unknown, would and did knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside of the United States and to a place in the United States from and through

a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, the bribery of a foreign official, in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit, WANG agreed to have payments transmitted from China to the United States and then from the United States to Trinidad and Tobago ("Trinidad") to effect the bribery of one or more officials of Antigua and Barbuda ("Antigua").

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO
(Money Laundering)

3.   From at least or about March 2013, up to and including at least in or about April 2013, in the Southern District of New York and elsewhere, JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, knowingly transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside of the United States and to a place in the United States from and through a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, the bribery of a foreign official, to wit, WANG transmitted and caused the transmission of payments from China to the United States and then from the United States to Trinidad to effect the bribery of one or more Antiguan officials.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

4.   I have been a Special Agent with the FBI for approximately seven years, and I have been personally involved in the investigation of this matter, which has been handled jointly by Special Agents of the FBI and Internal Revenue Service—Criminal Investigation.

5.   This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my review of email correspondence, my analysis of bank of records, my examination of documents and reports by others, my interviews of

2

witnesses, and my training and experience.[1] Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## OVERVIEW

6.     As set forth in greater detail below, an ongoing investigation has revealed that JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, agreed to and did pay a bribe of at least $500,000 to purchase Antiguan diplomatic positions for her late husband and another Chinese businessman ("CC-1"). This bribe was solicited and facilitated by the then-Permanent Representative to the United Nations ("UN") for Antigua (the "Antigua Ambassador"), and Francis Lorenzo, the then-Deputy Permanent Representative to the UN for the Dominican Republic ("Lorenzo").

7.     To funnel and help conceal the bribe, JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, and her co-conspirators, used United States-based bank accounts of and affiliated with a non-governmental organization (referred to herein as "NGO-2") based in New York, New York, of which WANG served as an officer, and which was purportedly established to promote the UN's development goals and sustainable development. As set forth in greater detail below, WANG paid the Antigua Ambassador out of bank accounts of NGO-2, received money from China into a bank account of NGO-2, transferred that money into the bank account of an affiliated entity, and then transmitted that money to Trinidad in exchange for the diplomatic positions that her husband and CC-1 sought and received.

---

[1]     The emails cited herein were obtained pursuant to search warrants of personal accounts of JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, and/or others involved in the conduct described herein.

3

**RELEVANT INDIVIDUALS AND ENTITIES**

*The Defendant*

8.  Based on my review of documents, my interviews of witnesses, and my conversations with law enforcement officers and others, I have learned the following, in substance and in part:

   a.  JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, was born in China and is a naturalized United States citizen who principally resides in New York, New York, and maintains property in southern California.

   b.  WANG typically uses her middle name, "Vivian," in professional interactions in the United States.

   c.  Starting by at least in or about 2010, WANG served as the Vice President at a particular NGO ("NGO-1"), headquartered in New York, New York. Along with her late husband ("WANG's husband"), WANG also founded and served as the Vice President of a second NGO ("NGO-2"), also headquartered in New York, New York, which shared both an office and multiple employees with NGO-1. NGO-2 publicly described its mission as advancing the implementation of the UN's development goals and promoting sustainable development. Among the projects with which WANG was involved was the development of an initiative, affiliated with NGO-2, with the stated aim of funding economic development in developing countries (the "Development Fund").

*The Antigua Ambassador and Co-Conspirators*

9.  Based on my participation in the investigation and my review of documents, I have learned the following, in substance and in part:

   a.  On or about October 20, 2015, a grand jury in this district returned an indictment against five defendants, 15 Cr. 706 (VSB) (the "Indictment"), including the Antigua Ambassador, who served as the Permanent Representative to the UN for Antigua until in or about December 2014, and as the elected President of the UN General Assembly between in or about September 2013 and in or about September 2014. The charges in the Indictment arise out of an international bribery, money laundering, and tax evasion scheme in which the Antigua Ambassador solicited and received payments and other things of value from Chinese businesspeople, including payments made through NGO-1, in return for official action. These payments were

4

facilitated by, among others, Lorenzo, who also was charged in the Indictment.

  b. Lorenzo subsequently agreed to cooperate with law enforcement in the hope of obtaining leniency at sentencing. Earlier today, in a public proceeding, Lorenzo pleaded guilty pursuant to a plea and cooperation agreement to conspiracy, bribery, money laundering, and tax offenses arising out of his participation in, among other things, the bribery and money laundering scheme alleged in the Indictment and the conduct described herein.

### THE SCHEME TO PURCHASE DIPLOMATIC POSITIONS FROM ANTIGUA

  10. Based on my participation in interviews of Lorenzo, I have learned, in substance and in part, the following:

  a. JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, and WANG's husband, informed Lorenzo that, in sum and substance, they sought to obtain at least an official diplomatic position, such as a consul or envoy, because they viewed such a position as a business opportunity. Specifically, they indicated that they believed that such a position would permit them to make money by assisting others to obtain so-called "economic citizenship" (that is, citizenship available to individuals who invest a certain amount in a country) and by arranging for business deals, which they could facilitate through such a position. WANG and WANG's husband further expressed, in sum and substance, that they were willing to make payments in connection with obtaining such a position.

  b. Lorenzo agreed to and did assist WANG and WANG's husband to obtain such a position for WANG's husband and for CC-1 through the Antigua Ambassador, in return for hundreds of thousands of dollars paid by WANG. Lorenzo understood from speaking with the Antigua Ambassador that at least a portion of the money was meant to pay off one or more Antiguan officials, including the then-Prime Minister of Antigua, in exchange for those officials approving the granting of the diplomatic positions.

  11. Based on my participation in the investigation, I have learned that the foregoing and other information provided by Lorenzo has been corroborated in multiple ways, including emails and financial records, as set forth in greater detail below.

12.  Based on my review of emails and other documents, including financial records, I have learned the following, in substance and in part, regarding discussions between and among the Antigua Ambassador, Lorenzo, JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, and WANG's husband, about obtaining and paying for a diplomatic position, and payments for such a position:

*The Antigua Ambassador Proposes the Plan*

a.  On or about April 17, 2012, the Antigua Ambassador sent an email to Lorenzo which stated in pertinent part: "You will recall that Vivian had said there were two guys who were interested in becoming our HC [honorary consul] in Hong Kong. If this is true, and if both are truly interested then perhaps one could choose Hong Kong and the other Shanghai. Assuming that this is possible I will need to get the folks at home [to] focus on this as soon as possible. For that to happen here's what I would need from each gentlemen to send me an email along the following lines: . . . ." This message was followed by a draft email addressed to the Antigua Ambassador that stated, among other things: "As we have agreed in our discussions, and in an effort to demonstrate my commitment to getting the process of consideration and subsequent approval by the relevant authority of your government underway as quickly as possible, I am prepared to make a contribution of US $ 250,000 immediately available, and upon my appointment to the aforementioned post, a similar amount of US $250,000." The draft email further proposed an additional yearly payment, "pending successful evaluation [ ] by your government on my effectiveness in delivering tangible opportunities from business enterprises in Hong Kong/Shanghai."

*Lorenzo Communicates the Plan to WANG's Husband and CC-1*

b.  On or about July 31, 2012, Lorenzo sent an email to WANG's husband, addressing him by his first name, stating, "enclose[d] see the letter that is needed for the honorary consulate." Following this sentence was a draft email, which was addressed to the Antigua Ambassador, and which largely matched the one that the Antigua Ambassador had sent Lorenzo on or about April 17, 2012, except that it spoke of a "contribution" without specifying the dollar amount.

c.  On or about December 11, 2012, Lorenzo sent an email to WANG's husband, stating that Lorenzo had had a meeting with "the Ambassador," concerning the interest of WANG's husband and CC-1 in

6

the "position," and that to obtain both that "position" and the "passport," "a deposit of 600 thousand will be needed."[2]

  d. In subsequent weeks, the Antigua Ambassador sent an email to Lorenzo, to be provided to CC-1, concerning CC-1's interest in serving as a representative of Antigua, and proposing to meet in Hong Kong in January. Lorenzo forwarded the email to WANG's husband.

  e. On or about January 9, 2013, Lorenzo sent an email to WANG's husband in which Lorenzo stated, "as per our last meeting enclose see letter as a follow up." The email attached a letter from Lorenzo, on the letterhead of NGO-2, thanking WANG's husband and CC-1 for their interest in serving as representatives of Antigua, and proposing that "it would perhaps be in our mutual interest to identify the resources and funding needed and the areas of mutual benefit."

*An Initial Payment from Wang and Continued Interest in the Positions*

  f. On or about February 15, 2013, WANG wrote a check for $25,000 to the Antigua Ambassador from an account of NGO-2 in New York, New York (the "NGO-2 Account").

  g. On or about February 25, 2013, WANG sent an email to the Antigua Ambassador, addressing him by his first name, which stated, in pertinent part: "Attached docs are the letter from [first name of WANG's husband] And the Bio for [CC-1][.] You may have any question pls [l]et me know . All the best . Vivian" The email contained an unsigned letter from WANG's husband, "formally confim[ing]" his interest in serving as an "Economic Envoy" of Antigua, stating that he was "pleased" that CC-1 "agreed to join me in this endeavor," and further stating that WANG's husband would "proceed to make the agreed contribution (US$ half million)."

  h. Approximately three hours later, WANG sent an email to the Antigua Ambassador with no separate text but that attached a signed version of the letter from WANG's husband.

---

[2] From my participation in interviews of Lorenzo, I have learned, in substance and in part, that although $500,000 was the original proposed "contribution," the Antigua Ambassador advised Lorenzo at another point that an additional $100,000, for purported due diligence, would be required to obtain the positions and passports sought.

*The Official Appointments*

i. On or about March 6, 2013, the Antigua Ambassador sent an email to WANG, stating in pertinent part, "please find attached the formal response to [first name of WANG's husband]'s letter of 25 Feb." The email attached a letter, on Antigua Mission to the UN letterhead, from the Antigua Ambassador, in his capacity as "Ambassador/Permanent Representative," to WANG's Husband, informing him that Antigua was going to open an "Investment Office" in Hong Kong and that he would be appointed Economic Envoy/Honorary Consul.

j. Later the same day, an individual, using an official Antigua email account, sent to the Antigua Ambassador two commissions, signed by the then-Prime Minister of Antigua, one for WANG's husband, and one for CC-1, appointing WANG's husband the "head of the Antigua and Barbuda Investment Office (ABIO) in Hong Kong, SAR, China, in the capacity of Economic Envoy," and appointing CC-1 the Deputy Economic Envoy in the same office.

*The $500,000 Payment*

k. Approximately two weeks later, on or about March 19, 2013, CC-1 caused a wire, in the amount of approximately $500,000, to be sent from China to the NGO-2 Account.

l. On or about April 1, 2013, the Antigua Ambassador sent an email from his official UN email account to his personal email account, containing information for a certain bank account in Trinidad in the name of a company (the "Trinidad Company" and the "Trinidad Company Account"). Based on its name, the Trinidad Company appeared to be a publisher of educational materials.

m. The following day, WANG sent an email to the Antigua Ambassador with the subject line, "RECEIPT." The email contained no separate text, but attached a wire transfer form, indicating that WANG had authorized $500,000 to be sent from NGO-2 to the Trinidad Company Account. The form stated, under "Information for the Beneficiary," that the payment was "From: [WANG's husband], [CC-1]".

n. Over the next few months, the Antigua Ambassador, Lorenzo, and WANG traded a number of emails that discussed setting up the Antigua Investment Office in Hong Kong and obtaining diplomatic passports from Antigua for WANG's husband and CC-1. During the same period, WANG informed the Antigua Ambassador, among other things,

8

that WANG's husband had arranged for a "nice suit for you in [Hong Kong]," which the Antigua Ambassador could pick up on his next visit.

13. Based on my review of financial records, my review of correspondence, and my conversations with another law enforcement officer who has performed an ongoing analysis of the financial records, I have learned the following, which indicates, in sum and among other things, that (i) the $500,000 payment made by JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, was transferred through multiple accounts on its way to Trinidad, (ii) some of the money was sent to Trinidad, only to be sent back to the United States, (iii) at least some of the money was transferred to family members of an Antiguan official, and (iv) WANG also began making regular payments directly to the Antigua Ambassador, through NGO-2, shortly after making the $500,000 payment. More specifically, the records indicate, in substance and in part, the following:

    a. Rather than transmit $500,000 directly from the NGO-2 Account to the Trinidad Company Account, WANG first transferred $500,000 from the NGO-2 Account to a bank account of the Development Fund, also in New York, New York, and then, one day later, wired $500,000 from that account to the Trinidad Company Account.

    b. Subsequent to the $500,000 arriving in the Trinidad Company Account, sums of money were wired from the Trinidad Company Account to various accounts, including money that was sent back to bank accounts in the United States belonging to or affiliated with family members of the then-Minister of State in the office of the Prime Minister of Antigua. Based on my training and experience and my involvement in this investigation, none of these transfers appears related to the apparent mission of the Trinidad Company, namely, publishing of educational materials.

    c. Starting less than two weeks after WANG wired money to the Trinidad Company Account, the Antigua Ambassador began to receive $10,000 a month from NGO-2 by check, nearly all of which were signed by WANG.

14. Based on my participation in the investigation and my training and experience, I am not aware of a legitimate reason for NGO-2 to receive money from abroad into a business bank account, transfer it to a second business bank account, and then transfer it back abroad to a third business bank account in an approximately two week period.

15.     Based on my review of documents and interviews of an individual who ran the Development Fund during the relevant time period ("Individual-1"), I have learned the following, in substance and in part:

      a.     Individual-1 was not aware of the Development Fund bank account used by JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, to send funds to the Trinidad Company Account. Individual-1 also was not aware of any relationship between the Development Fund and the Trinidad Company.

16.     Based on my review of financial records and my conversations with another law enforcement officer, I have learned, in substance in and part, that between in about August 2014 and in or about January 2015, after WANG's husband passed away, JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, transmitted more than $200,000 from the Development Fund to a company in California to pay for WANG's husband's cemetery plot and/or related expenses. Based on my interviews of Individual-1, I have learned that Individual-1 was also not aware of these payments.

16.     Based on my review of legal documents, I have learned that bribery of a public official is illegal in Antigua under the Prevention of Corruption Act, which was enacted by the Antiguan Parliament on or about November 5, 2004.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of JULIA VIVI WANG, a/k/a "Julia Vivian Wang," a/k/a "Vivian Pink," a/k/a "Wang Wei," the defendant, and that she be imprisoned or bailed, as the case may be.

_____
JASON P. ALBERTS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
16th day of March, 2016

_____
THE HONORABLE BARBARA C. MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK